UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/29/14
```

MICHAEL BANDLER and MB & CO. LTD.
d/b/a Bandler and Company,

                    Plaintiffs,

        v.

BPCM NYC, LTD., BPCM WORLDWIDE,
LTD., BPCM LA, LTD., BLUE STRIPE,
LTD., CARRIE ELLEN PHILLIPS,
VANESSA VON BISMARCK, ALI
FROLEY and LAURA WOODWARD,

                    Defendants.

**MEMORANDUM
OPINION & ORDER**

12 Civ. 3512 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiffs Michael Bandler and MB & Co. Ltd., d/b/a Bandler and Company,

bring this action against Defendants BPCM NYC, Ltd., BPCM Worldwide, Ltd., BPCM LA

Ltd., and Blue Stripe, Ltd. (the "BPCM Entities"), as well as BPCM principals Carrie Ellen

Phillips, Vanessa von Bismarck, Ali Froley, and Laura Woodard  (the "Individual Defendants"),

in connection with accounting and other financial services that Plaintiffs provided to the BPCM

Entities between 2006 and 2012.  (Am. Cmplt. (Dkt. No. 33); see Bandler Aff. (Dkt. No. 55), Ex.

15 ("Phillips Dep. Tr.") at 13)  Plaintiffs assert claims for "services rendered and not paid,"

breach of contract, unjust enrichment, conversion, and civil conspiracy.  Jurisdiction is based on

diversity of citizenship.  (Am. Cmplt. (Dkt. No. 33) ¶ 2)

        Defendants have moved for summary judgment on all of Plaintiffs' claims, except

for the Amended Complaint's "First Cause of Action" for "services rendered but not paid."

(Dkt. No. 41)  Defendants have also moved for sanctions under Fed. R. Civ. P. 11 and 28 U.S.C.

§ 1927, based on Plaintiffs' conversion and civil conspiracy claims.  (Dkt. Nos. 47, 58)  For the

reasons stated below, Defendants' motion for summary judgment will be granted in part and denied in part, and Defendant's motion for sanctions will be denied.

## BACKGROUND[1]

### I.    FACTS

#### A.    Alleged Agreements

On January 10, 2006, Plaintiff Michael Bandler and the BPCM Entities entered into an agreement in which Bandler agreed to provide accounting services to BPCM.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶ 1)  The agreement states that Bandler will be paid "a fee for part 1 work of $3,750, a quarterly fee of $795, an annual corporate tax compliance fee of $795 and an annual personal tax compliance fee of $295 per individual."  (Id. ¶ 2)  The total fees to be paid to Bandler under the agreement amount to $8,315.  (Id. ¶ 3)  The agreement – which was signed by Bandler and Defendant Carrie Phillips "on behalf of Bismarck Phillips Communication & Media" ("BPCM") – provided that "[e]ither of us may conclude this arrangement upon 60 days written notice to the other."  (Id. ¶ 4; Bandler Aff. (Dkt. No. 55), Ex. 30)

Plaintiffs claim that they entered into a second agreement with Defendants in August 2006.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶¶ 45-46)  Plaintiffs allege that they agreed to take over "basic bookkeeping" responsibilities for the BPCM Entities beginning on September 1, 2006, and that Defendants agreed to pay Plaintiffs $595 per week for their services through the end of 2006, and then $695 per week beginning on January 1, 2007.  (Id.)

---

[1]  Unless otherwise indicated, this Court cites to facts drawn from a party's Local Rule 56.1 statement where the opposing party has admitted those facts or has not controverted them with citations to admissible evidence.  See Giannullo v. City of N.Y., 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).

Basic bookkeeping included client invoicing, client payment posting and deposit, payroll, payroll

taxes, vendor bill processing, check preparation and bank reconciliation.  (See id. ¶ 44)

        The only copy of the alleged August 2006 contract produced during discovery is

an unsigned hard copy version that Bandler created on his home office computer.  (Pltf. R. 56.1

Stmt. (Dkt. No. 53) ¶¶ 8, 10; see Dec. 23, 2013 Krakowsky Decl. (Dkt. No. 44), Ex. 5)  This

document is dated August 24, 2006, and states that "[e]ither of us may conclude this arrangement

upon 90 days written notice to the other."  (Dec. 23, 2013 Krakowsky Decl. (Dkt. No. 44), Ex. 5)

Plaintiffs allege that this document reflects the agreed-upon terms of the August 2006 contract.

(Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶ 47)  According to Plaintiffs, Bandler brought

this document to BPCM's New York City office in August 2006, where he and Phillips executed

it.  (Id. ¶¶ 48-49)  Phillips kept the original hard copy of the signed document, and a copy was

scanned to the "Finance Drive" of the Corporate BPCM computer system.[2]  (Id. ¶¶ 11, 49)  The

BPCM Entities and Individual Defendants state that they have no record or recollection of this

alleged contract, and no copy of it has been produced in this litigation.  (See Def. R. 56.1 Stmt.

(Dkt. No. 42) ¶ 9)

        Plaintiffs claim that they entered into a third agreement with Defendants in April

2010.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶ 53)  According to Plaintiffs, the April

2010 contract – like the August 2006 contract – was executed by Bandler and Phillips at

BPCM's New York City office, and was scanned to the BPCM computer system. (Pltf. Resp. to

Def. R. 56.1 Stmt. (Dkt. No. 53) ¶ 54)  Philips again kept the original executed hard copy of the

contract.  (Id.)  According to Plaintiffs, the third agreement contains the following terms:

---

[2] The Finance Drive is a restricted section of the BPCM corporate computer system that contains
contracts, tax returns, financial statements, and similar documents.  (Pltf. R. 56.1 Stmt. ¶¶ 42, 43)

1. The broader spectrum of services provided by Plaintiffs to Defendants were listed, including Basic Bookkeeping, collections, supervision and liaison with foreign offices, quarterly internal financial statements, formal annual financial statements with an attest function, corporate and personal tax returns and other services that might be requested from time to time by Defendants.

2. The rates for the listed services were set forth: Basic Bookkeeping (BPCM NYC, Ltd $3,095 and BPCM LA, Ltd. $895), collections ($175 per hour), supervision and liaison with foreign offices ($250 or $175 per hour depending on services), quarterly internal financial statements ($250 per hour), formal annual financial statements with an attest function (to be priced annually) and corporate and personal tax returns ($250 per hour).

3. A written termination notice provision (the "Third Written Notice Termination Provision") of 120 days.

(Id. ¶ 55)  Bandler claims that he drafted this contract on his home office computer. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶ 10)  No copy of the alleged April 2010 contract has been produced.  (See id. ¶ 11)

Bandler's description of the pre-termination notice period that the parties allegedly agreed to has changed wildly and repeatedly during this litigation.  In his initial complaint, Bandler states that the parties entered into an agreement in January 2006 that provided for a pre-termination notice period of 90 days. (Cmplt. (Dkt. No. 1) ¶¶ 15, 17)  Bandler further represents in the Complaint that "[a]t no time between 2006 and 2011 did either party change, or request a change to the 90-day notice provision in the initial agreement." (Cmplt. (Dkt. No. 1) ¶ 19)  In response to Defendants' interrogatories, however, Bandler stated that the January 2006 contract contained a 60-day notice provision, while the April 2010 contract contained a 90-day notice provision. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶¶ 16-17)  At his October 9, 2013 deposition, however, Bandler testified that the April 2010 contract requires "something more than 90 days." (Bandler Aff. (Dkt. No. 55), Ex. 22 ("Bandler Dep. Tr.") at 70-71)  Finally, the Amended Complaint – which was filed on October 31, 2013 –

alleges that the April 2010 agreement requires 120 days' notice.  (Am. Cmplt. (Dkt. No. 33) ¶ 23)

Adding to the confusion, Defendants claim that they never entered into the alleged August 2006 and April 2010 contracts (See Philips Decl. (Dkt. No. 43) ¶¶ 2, 4-5; see also Krakowsky Decl. (Dkt. No. 44) ¶ 6), and – as noted above – no copy of these alleged agreements has been produced in this case.  Defendants further claim that Plaintiffs unilaterally changed their fees and overcharged Defendants without Defendant's knowledge for "several years."  (See Bandler Aff. (Dkt. No. 55), Ex. 44; Bandler Aff. (Dkt. No. 55), Ex. 15 ("Phillips Dep. Tr.") at 13-14, 17-18)

### B.    Plaintiffs' Termination

In a February 27, 2012 conference call, Phillips and von Bismarck informed Bandler that Defendants would no longer be using Plaintiffs' services.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶¶ 5, 60)  According to Phillips, Plaintiffs were terminated as a result of complaints about Bandler's aggressive behavior with BPCM clients and employees.  (Bandler Aff. (Dkt. No. 55), Ex. 15 ("Phillips Dep. Tr.") at 18)  Plaintiffs did not perform any further services for Defendants after the February 27, 2012 conference call.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶ 6)

In an April 2, 2012 letter to Bandler, Defendants' attorney stated that "to the extent it has not already been made clear, any relationship between [Plaintiffs] and BPCM has been terminated as of February 29, 2012."  (Bandler Aff. (Dkt. No. 55), Ex. 44; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶ 69)

C.     **Plaintiffs' Laptop Computers and Electronic Data**

While Plaintiffs were performing accounting services for Defendants between 2006 and 2012, they purchased two laptop computers that were kept at BPCM's New York office. (Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 53) ¶ 40)  One computer was purchased in or about 2006, while the other was purchased in 2009 or 2010. (Id. at ¶ 28)  The computers were connected to BPCM's computer servers – where Plaintiffs stored certain files -- and Defendants permitted Plaintiffs to access these servers remotely. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 50) at ¶¶ 41, 62; see Bandler Aff. (Dkt. No. 55), Ex. 22 ("Bandler Dep. Tr.") at 163)  Defendants also provided Bandler with a BPCM email account for Plaintiffs' use. (Id. at ¶ 41)

During the February 27, 2012 phone call – after Bandler was told that his services would no longer be needed – Bandler claims that he "asked for . . . the return of Plaintiffs' [c]omputers and data, which Defendants agreed to." (Id. at ¶¶ 60-61)

Shortly after the call, Bandler sent Phillips and von Bismarck a "confirmation" email, stating:

> Hello Ladies:
>
> I am writing to confirm that you informed me this AM, for the first time, that the services of MBCo would no longer be required.  I reminded you during that call that our agreement has notice provisions and consequences.
>
> I want to further confirm that you have been informed that this is a payroll week, the payroll has not been processed since you locked me off the computers and the numerous corporate and personal tax returns are due.
>
> M.

(Feb. 5, 2014 Bandler Aff. (Dkt. No. 55), Ex. 39; see also Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶ 61)

After the February 27, 2012 phone call, BPCM terminated Plaintiffs' remote access to its computer servers. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶ 30)  As a result, Plaintiffs could no longer access electronic files that they had stored on the BPCM servers.  (See id.)  Bandler lost access to his BPCM email account as well.  (Bandler Aff. (Dkt. No. 55), Ex. 22 ("Bandler Dep. Tr.") at 171)

On March 14, 2012, Bandler sent an email to Phillips and von Bismarck, stating:

Hello Ladies:

Several weeks have passed and I have heard nothing.
I have no payment of the invoices for work done.
The computers you were sending me have not arrived.
I have not seen the schedule of fees you mentioned in our call.
Please advise on each.

Pops

(Bandler Aff. (Dkt. No. 55) ¶ 23 & Ex. 41)  Bandler received no response to this email at that time.  (Bandler Aff. (Dkt. No. 55) ¶ 24; see Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶ 64; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 50) ¶ 64)

Plaintiffs subsequently purchased two replacement computers at a cost of approximately $1000 each.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶ 27)  Bandler claims that these computers were purchased in March or April 2012.  (Bandler Aff. (Dkt. No. 55) ¶ 30)  Plaintiffs have not offered any evidence of the value of the two laptop computers that were left at BPCM's office.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶ 29)

## II.   PROCEDURAL BACKGROUND AND POST-COMPLAINT CONDUCT

The Complaint in this action was filed on May 3, 2012, and asserts claims for breach of contract, "services rendered and not paid," unjust enrichment, and conversion related to two of Plaintiffs' laptop computers and "information and work product regarding other

[Bandler] clients that [was] stored on [Plaintiffs'] computers." (Cmplt. (Dkt. No. 1) ¶¶ 50-58, 94-102, 138-46, 182-90, 227-35, 272-80, 317-25, 362-99)

On May 29, 2012, a BPCM computer consultant – Corey Muszak – searched BPCM's servers for Plaintiffs' electronic files. (Dec. 23, 2013 Krakowsky Decl. (Dkt. No. 44), Ex. 9 ("Muszak Decl.") ¶¶ 1, 5) He found only four Bandler files that related to Bandler clients other than BPCM. (Pltf. Resp. to Def. Rule 56.1 Stmt. (Dkt. No. 53) ¶ 32) According to Bandler, the BPCM email system was not searched at that time. (See id.)

In a May 30, 2012 letter, defense counsel informed Plaintiffs that Muszak had searched the BPCM servers for Bandler's files, and provided a declaration from Muszak reporting the results of this search. (See Dec. 23, 2013 Krakowsky Decl. (Dkt. No. 44), Ex. 19) In this letter, defense counsel also states that "[t]he two computers have always been available for Mr. Bandler to pick up and they remain available to him even now." (Id., Ex. 19 at 3) In a June 12, 2012 letter to Bandler, defense counsel reiterated that "[t]he two computers you allege were converted remain available for pick-up." (Id., Ex. 20 at 2) Bandler did not retrieve the computers, however. (See Bandler Aff. (Dkt. No. 55), Ex. 22 ("Bandler Dep. Tr.") at 105)

On June 19, 2012, Bandler met with Muszak at BPCM's New York City office, and Muszak "handed [Bandler] the two [laptop] computers and said[, 'H]ere, they're yours.'" (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 50) ¶¶ 71-73; Bandler Aff. (Dkt. No. 55), Ex. 22 ("Bandler Dep. Tr.") at 105, 109) Bandler refused to accept the computers, however, claiming that he "had already purchased replacement computers, . . . [and that] the[ ] [laptops] were supposed to have been returned to [him] months before and, therefore, they were of no use to [him]." (Bandler Aff. (Dkt. No. 55), Ex. 22 ("Bandler Dep. Tr.") at 105)

8

Muszak claims that he provided Bandler with a computer monitor during the June 2012 visit, so that Bandler could identify Plaintiffs' files on the BPCM servers. (Bandler Aff. (Dkt. No. 55), Ex. 16 ("Muszak Dep. Tr.") at 37)  Bandler was not permitted to copy or print anything, however. (Def. Resp. R. 56.1 Stmt. (Dkt. No. 50) ¶ 73)  Bandler alleges that he asked to review information on the Finance Drive, but that Muszak stated that he was "not authorized to [allow Bandler to] do so [and] . . . would pass [Bandler's request] on to the higher-ups." (Bandler Aff. (Dkt. No. 55), Ex. 22 ("Bandler Dep. Tr.") at 111)  Muszak testified, however, that Bandler "was not restricted in any way.  Anything he asked for[,] [he] was provided access to view." (Bandler Aff. (Dkt. No. 55), Ex. 16 ("Muszak Dep. Tr.") 38)   According to Muszak, Bandler was given "access to the [F]inance [D]rive" and to "all e-mail correspondence that involved [Bandler] or his employees." (Id.)  Bandler claims that during this meeting he requested that BPCM return "data contained in . . . 51 MBCo profiles [on BPCM's servers], which included the Finance Drive, and all [of] Plaintiff['s] emails." (Bandler Aff. (Dkt. No. 55) ¶ 35)

On July 5, 2012, Plaintiffs' counsel sent a letter to defense counsel requesting that Defendants provide the following items on a compact disc ("CD"):

> 1) The 51 items contained in profiles identified during [Bandler's] visit [to BPMC].  If an item contains sub-items, that will be provided as well;
>
> 2) The 61,946 emails identified during the visit, in a format that can be opened with Microsoft Outlook and can be sorted by sender, recipient, and date[;] [and]
>
> 3) A listing of what has been removed from profiles and emails since [Bandler's] last day of access.

(Id., Ex. 46)

On July 18, 2012, defense counsel sent the requested CD to Plaintiffs' counsel. (See id., Ex. 47)  According to Plaintiffs, the disc contains "a copy of the data requested by Mr.

9

Bandler, except for a copy of the Finance Drive." (See Pltf. R. 56.1 Stmt. (Dkt. No. 53) ¶ 75)

Defendants claim that Plaintiffs never requested the Finance Drive. (See Def. Resp. R. 56.1

Stmt. (Dkt. No. 50) ¶ 75)  In a cover letter accompanying the CD, defense counsel reiterated that

"[t]he two computers that Mr. Bandler alleges were converted remain available for pickup, as

they have always been since he was terminated." (Feb. 5, 2014 Bandler Aff. (Dkt. No. 55), Ex.

47)

On October 11, 2013, after the close of discovery, both sides filed pre-motion

letters seeking permission to file motions for summary judgment. (Dkt. Nos. 19, 20, 21)

Defendants stated that they intended to move for sanctions as well. (Dkt. No. 19)

At a pre-motion conference on October 21, 2013, this Court expressed concern

about the proposed motions, observing, inter alia, that there appeared to be issues of fact as to the

length of any pre-termination notice period. (Oct. 21, 2013 Tr. (Dkt. No. 26) at 2-3, 7-8)  The

Court also discussed the viability of Plaintiffs' conversion claim in light of Defendants'

representation that the electronic data and two laptop computers were made available to

Plaintiffs long ago. (Id. at 4-5, 7-8)

At the conclusion of the conference, and with Defendants' consent, Plaintiffs were

granted leave to file an Amended Complaint. (Id. at 12-13)  The parties were instructed to

inform the Court by letter as to whether they intended to pursue their proposed motions in light

of the discussion at the pre-motion conference. (Id. at 18-19)

In an October 25, 2013 letter, Plaintiffs stated that they would not be filing a

summary judgment motion. (See Dkt. No. 23)  In an October 28, 2013 letter, Defendants stated

that they would file a summary judgment motion and would decide – after the Amended

Complaint was filed – whether to move for sanctions. (Dkt. No. 24)

Plaintiffs filed the Amended Complaint on October 31, 2013.[3]   (Am. Cmplt. (Dkt. No. 33))  The Amended Complaint contains the same causes of action as the original complaint. On December 23, 2013, Defendants moved for summary judgment on all of Plaintiffs' claims, except for the "services rendered but not paid" claim.  (Dkt. No. 41)  Defendants also moved for sanctions under Fed. R. Civ. P. 11 and 28 U.S.C. § 1927.[4]  (Dkt. Nos. 41, 47, 58)

## DISCUSSION

### I.   LEGAL STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

---

[3] The Amended Complaint was served on opposing counsel and received by the Court on October 31, 2013, but was not filed on the ECF system until January 23, 2014. (See Pltf. Summary Judgment Br. ("Pltf. S.J. Br.") (Dkt. No. 52) at 9; Am. Cmplt. (Dkt. No. 33))  Because the Amended Complaint was timely served on Defendants and received by the Court, it will be deemed electronically filed on October 31, 2013.

[4] Defendants' motion for sanctions under Fed. R. Civ. P. 11 was originally part of their motion for summary judgment. (See Def. S.J. Br. (Dkt. No. 45) at 22-24)  That portion of Defendants' summary judgment papers that relates to Rule 11 sanctions was subsequently withdrawn and then re-filed as a separate motion, however, in order to comply with Fed. R. Civ. P. 11(c)(2), which provides that "[a] motion for sanctions must be made separately from any other motion. . . ." See Dkt. No. 46; Def. Sanctions Br. (Dkt. No. 48) at 1.

## II.   DEFENDANTS' MOTIONS WERE FILED IN COMPLIANCE WITH THIS COURT'S INDIVIDUAL RULES

As a preliminary matter, Plaintiffs object to Defendants' motions to the extent that they address issues other than the pre-termination notice provision(s) of the alleged agreements. (Pltf. Br. (Dkt. No. 52) at 9-10)  Plaintiffs complain that Defendants' motions go beyond what Defendants stated they would pursue in their October 28, 2013 letter to the Court.  (Id.)

While it is true that Defendants primarily discuss the pre-termination notice issue in their October 28 letter (see Oct. 28, 2013 Def. Ltr. (Dkt. No. 24)), Defendants raised the other grounds on which they now move in their October 11 pre-motion letter, and those grounds were also discussed at the pre-motion conference.  (See Oct. 11, 2013 Def. Ltr. (Dkt. No. 19); Oct. 20, 2013 Tr. (Dkt. No. 26))  Moreover, Defendants' proposed motion for sanctions was discussed in Defendants' October 11 pre-motion letter, at the pre-motion conference, and in the October 28 letter.  (See Oct. 11, 2013 Def. Ltr. (Dkt. No. 19); Oct. 20, 2013 Tr. (Dkt. No. 26); Oct. 28, 2013 Def. Ltr. (Dkt. No. 24))  Accordingly, Defendants have complied with this Court's Individual Rules of Practice (see Individual Rules of Practice of Judge Gardephe for Civil Cases, Rule 4(A)), and their motions will be considered in their entirety.

## III.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS RELATING TO BREACH OF THE ALLEGED PRE-TERMINATION NOTICE PROVISION

In the Amended Complaint's Second Cause of Action, Plaintiffs seek to recover $42,504. 66, reflecting the alleged value of their services between February 27, 2012 and April 3, 2012. (Am. Cmplt. (Dkt. No. 33) ¶¶ 39-49)  Although Plaintiffs concede that they provided no services to Defendants during this period of time (see Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶ 6), they argue that Defendants are liable for this amount because their February 27, 2012 oral termination was not effective, and the parties' agreement was thus not terminated until

written notice of termination was provided on April 3, 2012.  (Am. Cmplt. (Dkt. No. 33) ¶¶ 39-49)  Plaintiffs' calculation of damages is extrapolated <u>pro rata</u> from Plaintiffs' billings to BPCM in 2011.  (<u>See id.</u> ¶¶ 46-47)

In the Amended Complaint's Third Cause of Action, Plaintiffs seek to recover $130,783.60, reflecting the alleged value of their services for the 120-day period after written notice of termination was provided on April 3, 2012.  (<u>Id.</u> ¶¶ 50-55)  Once again, Plaintiffs concede that they provided no services to Defendants during this period of time.  (<u>see</u> Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶ 6)  As with the Second Cause of Action, Plaintiffs' damage calculations extrapolate from what Plaintiffs billed BPCM in 2011.  (<u>See id.</u> ¶¶ 46, 53)

Defendants concede that the January 2006 contract contains a provision requiring 60 days written notice prior to termination.  (Def. R. 56.1 Stmt. (Dkt. No. 42) ¶ 4)  Defendants argue, however, that Plaintiffs' claims under the alleged August 2006 and April 2010 contracts fail as a matter of law, because the evidence Plaintiffs have offered regarding the terms of those alleged contracts is (1) inadmissible under the Best Evidence Rule, and (2) unreliable.  (Def. S.J. Br. (Dkt. No. 45) at 6-16)  Defendants further claim that the January 2006 contract does not entitle Plaintiffs to the relief they seek.  (<u>Id.</u> at 16-18)

### A.    Secondary Evidence of the Terms of the Alleged August 2006 and April 2010 Contracts Is Admissible Under the Best Evidence Rule

Defendants argue that they are entitled to summary judgment on the Amended Complaint's Second and Third Causes of Action because Plaintiffs have not proffered admissible evidence of the August 2006 and April 2010 agreements.  (Def. S.J. Br. (Dkt. No. 45) at 6-11)  Because the alleged contracts have not been produced, Plaintiffs rely on secondary evidence to prove their terms.  Defendants claim that such evidence is barred by the Best Evidence Rule.  (<u>Id.</u>)

"[T]he 'best evidence' rule [is] codified at Rule[s] [1002 through] 1004 of the Federal Rules of Evidence." Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).  Federal Rule of Evidence 1002 provides that "[a]n original writing . . . is required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002.  Fed. R. Evid. 1004 excuses the absence of an original writing under certain circumstances, however:

> An original is not required and other evidence of the content of a writing . . . is admissible if:
>
> (a) all the originals are lost or destroyed, and not by the proponent acting in bad faith;
>
> (b) an original cannot be obtained by any available judicial process;
>
> (c) the party against whom the original would be offered had control of the original; was at that time put on notice, by pleadings or otherwise, that the original would be a subject of proof at the trial or hearing; and fails to produce it at the trial or hearing; or
>
> (d) the writing . . . is not closely related to a controlling issue.

Fed. R. Evid. 1004; see Burt Rigid Box, Inc., 302 F.3d at 91 n.5 ("Rule 1004 provides, in relevant part, that '[t]he original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if . . . [a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith. . . .'" (quoting Fed. R. Evid. 1004(a))).

"The party seeking to prove the contents of the writing must establish a proper excuse for the non-production of the document and that the original did exist." A.F.L. Falck, S.p.A. v. E.A. Karay Co., Inc., 722 F. Supp. 12, 16 (S.D.N.Y. 1989), on reargument, 131 F.R.D. 46 (S.D.N.Y. 1990).  "However, where that writing was last in the control of the opposing party, if the proponent of the writing can show that the opponent had control over the document, that he demanded the document from the opponent and that the opponent has failed to produce the document, secondary evidence may be used to illustrate the existence of the document." Id.

In their response to Plaintiffs' Local Rule 56.1 statement, Defendants admit the

facts necessary to excuse production of the original alleged contracts. For example, as to the

alleged August 2006 contract, Defendants admit that

> Bandler brought the Second Agreement [in August 2006] to the Corporate BPCM
> office in New York City. . . .
>
> . . . He and Ms. Phillips executed it, the paper document was scanned, the scan
> was placed on the Corporate BPCM computer system and the paper copy was
> returned to Ms. Phillips[.] ([A] signed copy of the Second Agreement cannot
> be presented because Ms. Phillips has failed to produce the paper copy and
> Mr. Bandler has been denied access to the Corporate BPCM computer system[.])

(Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 50) ¶¶ 48-49) Similarly, as to the April 2010

contract, Defendants admit that

> [i]n April 2010, Mr. Bandler emailed Ms. Phillips, Ms. Bismarck and Tara
> Cathcart (the Director of the New York City office) requesting an increase in the
> Basic Bookkeeping fees. . .
>
> . . . A few days later, Mr. Bandler came to the Corporate BPCM New York City
> offices with a written confirmation of the parties' updated arrangement (the
> "Third Agreement"). . . .
>
> . . . Mr. Bandler and Ms. Phillips executed the Third Agreement, the document
> was scanned, the scan was placed on the Corporate BPCM computer system
> and the paper copy was returned to Ms. Phillips[.] ([A] signed copy of the
> Third Agreement cannot be presented because Ms. Phillips has failed to
> produce the paper copy and Mr. Bandler has been denied access to the
> Corporate BPCM computer system[.])

(Id. ¶¶ 52-54) Accordingly, Fed. R. Evid. 1002 does not preclude this Court's consideration of

the evidence Plaintiffs have put forth concerning the alleged August 2006 and April 2010

contracts.[5]

---

[5] Plaintiffs argue that Defendants' failure to preserve the alleged August 2006 and April 2010
contracts amounts to spoliation, and they ask the Court to "impose an adverse inference
regarding the existence of signed copies of the Second and Third Agreements on the Finance
Drive, relieve Plaintiffs of any obligation to produce the Second and Third Agreements and
impose upon Defendants an obligation to effect and pay for expert review of the Finance Drive
seeking the 'lost' agreements." (Pltf. Br. (Dkt. No. 52) at 20-23) Plaintiffs' application is, at
best, premature. On the present record, this Court cannot determine as a matter of law whether

Whether the secondary evidence offered by Plaintiffs concerning the terms of the alleged August 2006 and April 2010 contracts is sufficiently reliable to provide the basis for a breach of contract action remains at issue, however. That determination is committed to the sound discretion of the district court. See Archie Comic Publications, Inc. v. DeCarlo, 258 F. Supp. 2d 315, 329-31 (S.D.N.Y. 2003), judgment entered, No. 00 Civ. 5686 (LAK), 2003 WL 21354692 (S.D.N.Y. June 11, 2003), aff'd, 88 F. App'x 468 (2d Cir. 2004).

**B.    The Record Creates No Genuine Issue of Material Fact As To Whether the Parties Ever Reached a "Meeting of the Minds" Regarding the Pre-Termination Notice Provision**

"To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." Express Indus. & Terminal Corp. v. New York State Dep't of Transp., 93 N.Y.2d 584, 589 (1999). "'Under New York law, an agreement is enforceable if a meeting of the minds has occurred as to the contract's "material terms."'" Major League Baseball Properties, Inc. v. Opening Day Prods., Inc., 385 F. Supp. 2d 256, 270-71 (S.D.N.Y. 2005) (quoting Michael Coppel Promotions Pty. Ltd. v. Bolton, 982 F. Supp. 950, 954 (S.D.N.Y. 1997)).

"[A] court cannot enforce a contract unless it is able to determine what in fact the parties have agreed to." 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp., 78 N.Y.2d 88, 91 (1991). Stated another way, "[c]ourts cannot aid parties who have not specified the terms of

---

the alleged August 2006 and April 2010 contracts ever existed, much less whether Defendants destroyed these documents "with a culpable state of mind." See Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002) ("[A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.").

their own agreements." Trimmer v. Van Bomel, 107 Misc. 2d 201, 211 (N.Y. Sup. Ct. N.Y.

Cnty. 1980). "[I]f [a contract] is . . . ambiguous, the Court must assess whether the parties

reached a 'meeting of the minds' when entering into the agreement, that is whether those terms

were, in fact, differently understood by the contracting parties." Int'l Paper Co. v. Suwyn, 966 F.

Supp. 246, 253 (S.D.N.Y. 1997). "[W]here an agreement is ambiguous, the court may look to

extrinsic evidence to determine the parties' intent." Consol. Edison, Inc. v. Ne. Utilities, 332 F.

Supp. 2d 639, 647 (S.D.N.Y. 2004). "When the provisions of the contract are susceptible to

conflicting constructions and when there is also relevant extrinsic evidence of the parties' actual

intent, the meaning of the provisions becomes an issue of fact barring summary judgment."

Williams & Sons Erectors, Inc. v. S. Carolina Steel Corp., 983 F.2d 1176, 1183-84 (2d Cir.

1993) (emphasis in original). "Ambiguity without the existence of extrinsic evidence of intent

presents not an issue of fact, but an issue of law for the court to rule on," however. Id. "[I]n

order for the parties' intent to become an issue of fact barring summary judgment, there must . . .

exist relevant extrinsic evidence of the parties' actual intent." Mellon Bank, N.A. v. United

Bank Corp. of New York, 31 F.3d 113, 116 (2d Cir. 1994). Where the Court finds that "there

was never a meeting of the minds between the parties[,] . . . summary judgment [denying

recovery] on . . . [a] breach of contract [claim] [may be] granted." See Major League Baseball

Properties, Inc., 385 F. Supp. 2d at 272.

   Defendants argue that the evidence Plaintiffs have offered concerning the pre-

termination notice provision is so inconsistent and unreliable that it is not sufficient to raise a

genuine issue of material fact. (See Def. Br. (Dkt. No. 45) at 11-19); see also Archie Comic

Publications, Inc., 258 F. Supp. 2d at 329 ("The best evidence rule ordinarily requires that the

terms of a written instrument be proved by the instrument itself. Where, as here, the original

instrument has been lost, its contents may be proved by other evidence. And that is what DeCarlo has sought to do. The question is whether the evidence is sufficient to raise a genuine issue of material fact."). This Court agrees.

As an initial matter, given the absence of the alleged contracts, and Bandler's ever-shifting and contradictory description of the pre-termination notice provision, no reasonable jury could find that – as of February 2012 – an agreement was in place as to a particular period of time for pre-termination notice. As discussed above, at various points in time during this litigation, Bandler has asserted – as to the alleged April 2010 agreement – that it provides for a 90 day notice period, "something more than 90 days," and 120 days' notice. As to the alleged 2006 contracts, Bandler has asserted both that the notice period was 90 days and 60 days. More broadly, Bandler has claimed that a 90 day notice period applied throughout the parties' relationship – from 2006 through February 2012 – and that the notice period morphed from 60 days, to 90 days, to "something more than 90 [days]," to 120 days.

Under these circumstances, no reasonable jury could find by a preponderance of the evidence that as of February 27, 2012 – when Plaintiffs claim that Defendants wrongfully terminated the contract – the parties had agreed to a particular period of time for pre-termination notice. In failing to proffer "reliable and competent secondary evidence" as to the terms of the alleged pre-termination notice provision, see Glew v. Cigna Grp. Ins., 590 F. Supp. 2d 395, 411 (E.D.N.Y. 2008), Plaintiffs have not demonstrated the existence of a genuine issue of material fact that precludes summary judgment. See Archie Comic Publications, Inc., 258 F. Supp. 2d at 329, 331 (noting that "'[r]elief for an alleged breach of a written contract cannot be granted where the alleged contract has not been produced, plaintiff's testimony regarding the alleged contract is inconclusive, [and] essential terms of the alleged contract are in doubt,'" and granting

defendant summary judgment where "the evidence before the Court d[id] not permit a reasoned, logical decision as to the terms of any . . . [of the] agreements . . . during the relevant period" (quoting Sims v. Blanchris, Inc., 648 F. Supp. 480, 485 (S.D.N.Y. 1986))).

      Even if Plaintiffs had offered sufficient evidence of an agreement in place as of February 27, 2012, concerning the period for pre-termination notice, the record contains no evidence that there was ever a "meeting of the minds" as to the remedy for breaching this provision. The January 2006 agreement makes no reference to a remedy, stating merely that "[e]ither of us may conclude this arrangement upon 60 days written notice to the other." (Feb. 5, 2014 Bandler Aff. (Dkt. No. 55), Ex. 30)  Accepting arguendo Plaintiffs' unreliable secondary evidence as to the terms of the August 2006 or April 2010 contracts, there is still no evidence that the parties ever had a "meeting of the minds" as to how damages would be calculated, including whether damages would be calculated based on a period of 60 days, 90 days, "something more than 90 [days]," or 120 days.  There is likewise no evidence that the parties ever contemplated, much less agreed to, the pro rata formula for damages utilized by Plaintiffs.

      Such evidence is particularly necessary here given that, by Plaintiffs' account, the parties' relationship changed dramatically between January 2006 and February 2012.  In January 2006, the parties entered into an agreement – providing for a 60 day pre-termination notice period – in which Plaintiffs would be paid annual compensation amounting to $8,315.  (Bandler Aff. (Dkt. No. 55), Ex. 30; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) at ¶ 3)  Plaintiffs contend that that quite modest relationship had – by February 2012 – grown into one in which they are entitled to $130,783.60 for a 120-day period, during which they performed no work. See Am. Cmplt. (Dkt. No. 33) ¶ 54; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶ 6.  But Plaintiffs' claim that Defendants entered into a contractual agreement that exposed them to this

level of damages must be supported by substantial evidence that such an agreement existed. There is no such evidence here. Cf. Posson v. Hayes, 37 A.D.3d 936, 938 (3d Dep't 2007) ("[T]here is no evidence that there was ever 'a meeting of the minds on the essential terms of the transaction' that would trigger plaintiff's entitlement to a commission. . . .'") (internal citations omitted).

Because Plaintiffs have not offered sufficient evidence to raise a genuine issue of material fact as to whether – as of February 2012 – the parties had an agreement in place concerning a pre-termination notice period and the remedies that would be implicated in the event that the notice provision was breached, Defendants are entitled to summary judgment on the Amended Complaint's Second and Third Causes of Action.

## IV. DEFENDANTS HAVE NOT DEMONSTRATED THAT THEY ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' UNJUST ENRICHMENT CLAIM

Given that Plaintiffs concede that they performed no work for Defendants after the oral termination on February 27, 2012 (see Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53)   ¶ 6), it is clear that Plaintiffs' unjust enrichment claim – the Amended Complaint's Fourth Cause of Action – is based on the theory that they performed work for Defendants prior to February 27, 2012, and were not properly compensated for this work.  Although Defendants have moved for summary judgment on Plaintiffs' unjust enrichment claim (see Def. Br. (Dkt. No. 45) at 3), they have not addressed this claim in their briefing.  Accordingly, their motion for summary judgment on the Fourth Cause of Action for unjust enrichment must be denied.

## V. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CONVERSION AND CIVIL CONSPIRACY CLAIMS

Plaintiffs' conversion and civil conspiracy claims – the Fifth and Sixth Causes of Action in the Amended Complaint – are based on the theory that Defendants exercised

unauthorized dominion and control over (1) the two laptop computers located at BPCM's New York office; and (2) certain data in electronic files stored on BPCM's servers and emails accessible through Bandler's BPCM email account.  (See Am. Cmplt. (Dkt. No. 33) ¶¶ 60-72, 82-87)

### A.   Conversion Claim

#### 1.   Elements of Conversion

"In New York, conversion is 'the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'"  AD Rendon Comme'ns, Inc. v. Lumina Americas, Inc., No. 04-CV-8832 (KMK), 2007 WL 2962591, at *4 (S.D.N.Y. Oct. 10, 2007) (quoting Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 403-04 (2d Cir. 2006)).  "[T]o establish a claim for conversion, a plaintiff must show that: '(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights.'"  Id. (quoting Moses v. Martin, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004) (internal quotation marks and citation omitted)).  "[K]ey elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights."  Colavito v. New York Organ Donor Network, Inc., 8 N.Y.3d 43, 50 (N.Y. 2006).

"For an action in conversion to lie when the original possession of the property is lawful, a plaintiff must make a demand for the allegedly converted property and the possessor must refuse."  Rendon Comme'ns, Inc., 2007 WL 2962591, at *4; see also Seanto Exports v. United Arab Agencies, 137 F. Supp. 2d 445, 451 (S.D.N.Y. 2001) ("'Where the original

possession is lawful, a conversion does not occur until the defendant refuses to return the property after demand or until he sooner disposes of the property.'" (quoting Schwartz v. Capital Liquidators, Inc., 984 F.2d 53, 53 (2d Cir. 1993) (internal citations and quotations omitted))). "A demand need not use the specific word 'demand' so long as it clearly conveys the exclusive claim of ownership. A demand consists of an assertion that one is the owner of the property and that the one upon whom the demand is made has no rights in it other than allowed by the demander." Feld v. Feld, 279 A.D.2d 393, 394-95 (1st Dep't 2001). "[A] refusal need not use the specific word 'refuse' so long as it clearly conveys an intent to interfere with the demander's possession or use of his property." Id. at 395.

"[E]lectronic records that were stored on a computer and were indistinguishable from printed documents . . . [are] subject to a claim of conversion in New York." Thyroff v. Nationwide Mut. Ins. Co., 8 N.Y.3d 283, 292-93 (2007); see also Shmueli v. Corcoran Grp., 9 Misc. 3d 589, 594 (Sup. Ct. N.Y. Cnty. 2005) ("[P]laintiff's computerized client/investor list is convertible property. This conclusion does not diminish plaintiff's burden to prove the existence of all the elements necessary to sustain a claim for conversion applicable in a case involving non-electronic documents and things.").

### 2.   Laptop Computers at BPCM's New York Office

Defendants argue that "[t]he two computers [at BPCM's office] have always been available for Bandler to retrieve" (Def. Br. (Dkt. No. 45) at 19), and that accordingly he has no valid claim for conversion based on these computers.

It is undisputed here that Defendants were originally in lawful possession of the laptops, which were kept at BPCM's New York office by mutual agreement. See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 53) ¶ 40); see also Niceforo v. UBS Global Asset Mgmt. Americas,

Inc., No. 12 Civ. 0033 (KPF) (FM), 2014 WL 2071041, at *3 (S.D.N.Y. May 16, 2014) ("It is undisputed that Niceforo voluntarily brought the notebook into the workplace. . . . UBS therefore acquired the property lawfully at the outset because Niceforo herself brought it to UBS's offices and left it there."). Accordingly, in order to prevail on their conversion claim, Plaintiffs must offer evidence showing that they demanded the return of the laptops, and that Defendants refused that demand. See Rendon Commc'ns, Inc., 2007 WL 2962591, at *4.

Assuming arguendo that Bandler requested the return of the laptops in the February 27, 2012 phone call, and that his March 12, 2012 email to Phillips and von Bismarck – in which he asks that they "please advise" him as to the return of the computers – constitutes a "demand" for the laptops, there is no evidence that Defendants – at any time – refused to return the laptops to Plaintiffs. Indeed, the evidence is all to the contrary. According to both sides, when Bandler asked Defendants for the return of the laptops in the February 27 call, Defendants agreed. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 50) ¶¶ 60-61) Similarly, in May 30 and June 12, 2012 letters, defense counsel told Plaintiffs that the laptops were available to be picked up, and always had been. (Dec. 23, 2013 Krakowsky Decl. (Dkt. No. 44), Exs. 19, 20) When Bandler went to BPCM's office in June 2012, Defendants' consultant handed him the laptops and told him, "[H]ere, they're yours." (Bandler Aff. (Dkt. No. 55), Ex. 22 ("Bandler Dep. Tr.") at 105, 109; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 50) ¶¶ 71-72)

The record here unambiguously demonstrates that Bandler (1) knew where the laptops were at all times; (2) was free to retrieve the laptops at any point in time; and (3) made no effort to retrieve the laptops. Cf. Sawabeh Info. Servs. Co. v. Brody, No. 11 Civ. 4164 (SAS), 2014 WL 46479, at *17 (S.D.N.Y. Jan. 6, 2014) ("Eagle waived her claim[ ] as to conversion . . . by failing to accept plaintiffs' offer to return her personal items on numerous occasions. . . .

Eagle had multiple opportunities to retrieve the items plaintiffs were willing to return. . . . She chose not to do so and has thus waived her conversion . . . claim[ ] entirely.").

The mere fact that the laptops remained at BPCM's office after the oral termination on February 27, 2012, does not demonstrate that Defendants had exercised control and dominion over them. It would be absurd to suggest that Plaintiffs can recover in conversion merely because they left their computers at Defendants' office and made no effort to retrieve them. Cf. Cohen v. Allied Van Lines, No. 01-102/196, 2002 WL 221078, at *1 (N.Y. App. Term. 1st Dep't Jan. 22, 2002) (per curiam) ("The record evidence is insufficient as a matter of fact and law to support plaintiff's recovery in conversion for the purported value of the furniture. . . . Defendant's conduct in warehousing the table and armoire did not equate to an actual interference with or dominion over the property to the exclusion of the plaintiff's rights. . . . Plaintiff was at all times on notice of the location of the items. . . . Plaintiff had the opportunity to reclaim her property at that time upon payment of nominal storage charges. . . . Yet, plaintiff does not show that any attempt was ever made to retrieve the items.") (internal citations omitted).

In sum, Plaintiffs have not offered sufficient evidence to raise a material issue of fact as to whether Defendants refused to return the two laptops to Plaintiffs. Because the record does not demonstrate that Defendants "'exercised an unauthorized dominion over the [laptops] in question, to the alteration of [their] condition or to the exclusion of the plaintiff[s'] rights,'" Rendon Commc'ns, Inc., 2007 WL 2962591, at *4 (quoting Moses, 360 F. Supp. 2d at 541), Defendants are entitled to summary judgment on Plaintiffs' conversion claim as it relates to the laptop computers.

### 3. **Electronic Data on BPCM's Servers and in BPCM's Email System**

Plaintiffs also claim that Defendants converted their electronic data – contained in electronic files on BPCM's servers and in emails in BPCM's email system – when Defendants terminated Plaintiffs' remote access to the servers and Bandler's access to his BPCM email account at the end of February 2012. (Am. Cmplt. (Dkt. No. 33) ¶¶ 67-72)

As with the two laptop computers, the parties agree that Bandler "asked for . . . the return of Plaintiffs' . . . data," and that "Defendants agreed to [this request,]" during the February 27, 2012 phone call. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 50) at ¶¶60-61) There is no evidence in the record, however, that Bandler identified – during the February 27, 2012 call – what "data" he was seeking. The confirmation email Bandler sent to Philips and von Bismarck later that day makes no reference to the return of Plaintiffs' data or emails. (See Feb. 5, 2014 Bandler Aff. (Dkt. No. 55), Ex. 39) Bandler's March 14, 2012 email to Philipps and von Bismarck likewise does not reference Plaintiffs' electronic data or emails. (See Feb. 5, 2014 Bandler Aff. (Dkt. No. 55), Ex. 41)

Given this record, Plaintiffs have not proffered evidence sufficient to raise a material issue of fact as to whether they demanded the return of specific electronic files and emails, and Defendants refused that request. Such a demand is required "where [a plaintiff's] property is [originally] held lawfully by [a] defendant," so "'that one in lawful possession shall not have such possession changed into an unlawful one until he "be informed of the defect of his title and have an opportunity to deliver the property to the true owner. . . ."'" Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc., 87 F.3d 44, 49 (2d Cir. 1996) (quoting Employers' Fire Ins. Co. v. Cotten, 245 N.Y. 102, 106 (1927)). Here, Plaintiffs chose to store their electronic files on Defendants' servers and their emails on Defendants' email system.

Accordingly, as with the laptops, Defendants' original possession of Plaintiffs' data and emails was concededly entirely lawful.

In this context, Bandler's vague request – during the February 27, 2012 call – that Defendants return "data" to him is not sufficient to have put Defendants on notice of what should be returned, and does not satisfy the demand requirement of a conversion claim. See Sawabeh Info. Servs. Co., 2014 WL 46479, at *17 (plaintiff's "conversion . . . claim[ ] fail[s] because he did not prove that he made a demand for the return of any . . . specific items") (emphasis in original); see also Thyroff v. Nationwide Mut. Ins. Co., 360 F. App'x 179, 181 (2d Cir. 2010) (summary order) ("[D]id Thyroff produce sufficient evidence of demand to survive summary judgment? We think not. . . . Only one of the documents Thyroff proffers to evidence demand arguably does so: the handwritten notes of a Nationwide employee stating that '[Thyroff had] indicated [to the Nationwide employee] he has lots of personal info on the computer + wants it back.' But 'lots of personal info' is inadequate to notify Nationwide of what electronic information he claimed superior right to, and demanded: The phrase could refer to anything from emails to customer lists."); cf. Chen v. New Trend Apparel, Inc., No. 11 Civ. 324 (GBD) (MHD), 2014 WL 1265916, at *35 (S.D.N.Y. Mar. 27, 2014) ("[T]o prove a claim of conversion, '"the plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing . . ."'" (quoting Schulz v. Dattero, 104 A.D.3d 831, 833 (2d Dep't 2013) (quoting Scott v. Fields, 85 A.D.3d 756, 757 (2d Dep't 2011)))) (emphasis added).[6]

---

[6] Plaintiffs' conversion claim also fails because they have offered no evidence of damages. When questioned at his deposition about his $500,000 damage claim, Bandler testified that his damages arose from the need "to recreate content which otherwise we would have had." Bandler could not identify any data, email, or class of emails that he had had to recreate, however. (Bandler Dep. 107) Bandler also suggested that his lack of access to his data and emails had

Accordingly, Defendants are entitled to summary judgment on Plaintiffs' conversion claim to the extent that claim is based on Defendants' alleged refusal to return electronic data and email to Plaintiffs.

**B.      Civil Conspiracy Claim**

"New York does not recognize civil conspiracy as an independent cause of action." Reich v. Lopez, No. 13-CV-5307 (JPO), 2014 WL 4067179, at *17 (S.D.N.Y. Aug. 18, 2014). "Rather, 'the damage for which recovery may be had in a civil action is not the conspiracy itself but the injury to the plaintiff produced by specific overt acts.'" Id. (quoting Rutkin v. Reinfeld, 229 F.2d 248, 252 (2d Cir. 1956)). "In other words, 'the charge of conspiracy in a civil action is merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible in damages for any overt act or acts.'" Id. (quoting Rutkin, 229 F.2d at 252). Accordingly, "[t]o establish a civil conspiracy, Plaintiffs 'must demonstrate the underlying tort. . . .'" Id. (quoting Treppel v. Biovail Corp., No. 03 Civ. 3002 (PKL), 2005 WL 2086339, at *5 (S.D.N.Y. Aug. 30, 2005)).

Here, the basis for the civil conspiracy claim is Plaintiffs' allegation that the Individual Defendants conspired to convert Plaintiffs' computers, data and emails. (See Am.

---

"hindered [him] in this lawsuit" and caused him to face an "ongoing risk" of IRS investigation and penalties based on tax returns he had filed on behalf of BPCM. (Id. at 171-73)

Bandler's testimony concerning Plaintiffs' damages from the alleged conversion is both circular and speculative, and Plaintiffs have produced no other evidence of damages resulting from the alleged conversion of their electronic data and email. Accordingly, Plaintiffs' "conversion . . . claims fail because . . . [they] did not assert a claim for damages, merely stating in a conclusory fashion that '[t]he monetary value of the items . . . would be impossible to judge.'" Sawabeh Info. Servs. Co., 2014 WL 46479, at *17; see also Brass v. Am. Film Techs., Inc., 780 F. Supp. 1001, 1003 (S.D.N.Y. 1991), aff'd in part, rev'd in part on other grounds, 987 F.2d 142 (2d Cir. 1993) ("It is well-established that in order to prove a conversion claim, a plaintiff must show . . . damages caused by the conversion.").

Cmplt. (Dkt. No. 33) ¶¶ 74-88)  "Since Plaintiffs have failed to sustain [the] underlying tort

claim[ ], [however,] they cannot sustain a claim for conspiracy." Cardona v. Cmty. Access, Inc.,

No. 11-CV-4129 (MKB), 2013 WL 304519, at *12 (E.D.N.Y. Jan. 25, 2013) (granting

defendants summary judgment on civil conspiracy claim where underlying conversion claim

failed); see also Nissan Motor Acceptance Corp. v. Scialpi, 94 A.D.3d 1067, 1069 (2d Dep't

2012) ("The respondents were entitled to summary judgment dismissing the causes of action to

recover damages for conspiracy to commit fraud and conspiracy to commit a tortious act insofar

as asserted against them, since a cause of action sounding in civil conspiracy cannot stand alone,

but stands or falls with the underlying torts."). Defendants' motion for summary judgment on

Plaintiffs' civil conspiracy claim will be granted.

## VI.   DEFENDANTS' MOTION FOR SANCTIONS WILL BE DENIED

Defendants ask this Court to impose sanctions on Plaintiffs – pursuant to Fed. R.

Civ. P 11 and 28 U.S.C. § 1927 – based on Plaintiffs' conversion and civil conspiracy claims.

(Def. Sanctions Br. (Dkt. No. 48) at 1; Def. S.J. Br. (Dkt. No. 45) at 22-24)  Defendants argue

that these claims "are demonstrably false, frivolous, and without a colorable basis" and "were

brought in bad faith."[7]  (Def. Sanctions Br. (Dkt. No. 48) at 3-4; Def. S.J. Br. (Dkt. No. 45) at

24)

"On motion or its own initiative, [a] court may, after notice and an opportunity to

respond, impose sanctions for violations of Rule 11(b)." Siegel v. Pro-Ex Sec., No. 02 Civ. 610

---

[7] Defendants cite to Bandler's history as a serial litigator, noting that he has been a party to 13
actions in federal court and 63 actions in state court. (See, e.g., Def. Sanctions Br. (Dkt. No. 48)
at 3-4; Def. S.J. Br. (Dkt. No. 45) at 23-24)  Courts have sanctioned Bandler in the past, and have
found his claims in litigation to be incredible. See id. The question before this Court, however,
is whether he has engaged in conduct in this case that warrants sanctions – not whether he has
brought baseless claims in the past.

(DLC), 2002 WL 1203851, *2 (S.D.N.Y. June 3, 2002).  In signing or filing a complaint, an

attorney

> [is] certif[ying] that to the best of the person's knowledge, information, and
> belief, formed after an inquiry reasonable under the circumstances:
>
> > (1) it is not being presented for any improper purpose, such as to harass, cause
> > unnecessary delay, or needlessly increase the cost of litigation;
> >
> > (2) the claims, defenses, and other legal contentions are warranted by existing
> > law or by a nonfrivolous argument for extending, modifying, or reversing
> > existing law or for establishing new law; [and]
> >
> > (3) the factual contentions have evidentiary support or, if specifically so
> > identified, will likely have evidentiary support after a reasonable opportunity
> > for further investigation or discovery[ ] . . .

Fed. R. Civ. P. 11(b).  "In determining whether a signer has violated Rule 11, a district court

applies an objective standard of reasonableness."  Derechin v. State Univ. of N.Y., 963 F.2d 513,

516 (2d Cir. 1992).

  "Although a represented party does not personally present a pleading to the court,

the client can be held responsible for the Rule 11 violation in appropriate circumstances."

Watkins v. Smith, No. 12 Civ. 4635 (DLC), 2013 WL 655085, at *10 (S.D.N.Y. Feb. 22, 2013),

aff'd, 561 F. App'x 46 (2d Cir. 2014).

> The Second Circuit has offered the following guidance on when it is appropriate
> to sanction a represented party:
>
> . . .
>
> > "[W]here the party . . . know[s] that the filing and signing is wrongful and
> > the attorney reasonably should know, then sanctions against both are
> > appropriate.  Where a party misleads an attorney as to facts or the purpose
> > of a lawsuit, but the attorney nevertheless had an objectively reasonable
> > basis to sign the papers in question, then sanctions on the party alone are
> > appropriate."

Id. at *11 (quoting <u>Calloway v. Marvel Entm't Grp.</u>, 854 F.2d 1452, 1474-75 (2d Cir. 1988),

<u>rev'd in part sub nom. on other grounds</u>, <u>Pavelic & LeFlore v. Marvel Entm't Grp.</u>, 493 U.S. 120

(1989)). "[R]egardless of the client's knowledge, [however,] a court may not impose a monetary

sanction 'against a represented party for violating Rule 11(b)(2).'" <u>Id.</u> at *11 (quoting Fed. R.

Civ. P. 11(c)(5)(A)).

"Rule 11(c) provides . . . that '[i]f . . . the court determines that subdivision (b)

has been violated, the court may . . . impose an appropriate sanction. . . .'" <u>Perez v. Posse</u>

<u>Comitatus</u>, 373 F.3d 321, 325 (2d Cir. 2004) (quoting Fed. R. Civ. P. 11(c)) (alterations in

original) (emphasis omitted). "The decision whether to impose a sanction for a Rule 11(b)

violation is thus committed to the district court's discretion." <u>Id.</u> "The Second Circuit has

cautioned that Rule 11 sanctions should be 'made with restraint.'" <u>Lorber v. Winston</u>, 993 F.

Supp. 2d 250, 253 (E.D.N.Y. 2014) (quoting <u>Schlaifer Nance & Co., Inc. v. Estate of Warhol</u>,

194 F.3d 323, 333 (2d Cir. 1999)). "[I]n imposing rule 11 sanctions, the court is to . . . resolve

all doubts in favor of the signer." <u>Oliveri v. Thompson</u>, 803 F.2d 1265, 1275 (2d Cir. 1986).

"Another basis for sanctions lies in 28 U.S.C. § 1927." <u>United States v. Int'l Bhd.</u>

<u>of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO</u>, 948 F.2d 1338, 1344

(2d Cir. 1991). Under this section, "[a]ny attorney . . . who so multiplies the proceedings in any

case unreasonably and vexatiously may be required by the court to satisfy personally the excess

costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C.

§ 1927. "To impose sanctions under [this section], a court must find clear evidence that (1) the

offending party's claims were entirely without color, and (2) the claims were brought in bad faith

– that is, 'motivated by improper purposes such as harassment or delay.'" <u>Eisemann v. Greene</u>,

204 F.3d 393, 396 (2d Cir. 2000) (quoting <u>Schlaifer Nance & Co.</u>, 194 F.3d at 336). "By its

terms, § 1927 looks to unreasonable and vexatious multiplications of proceedings[,] and it imposes an obligation on attorneys throughout the entire litigation to avoid dilatory tactics." Int'l Bhd., 948 F.2d at 1345.  The Second Circuit has "held that 'an award under § 1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.'"  Id. (quoting Oliveri, 803 F.2d at 1273).  "In contrast with sanctions under Rule 11, awards pursuant to § 1927 may be imposed only against the offending attorney; clients may not be saddled with such awards."  Id.

As discussed above, Plaintiffs' conversion and conspiracy claims have no merit. The claims are not so entirely without foundation as to be considered utterly frivolous or brought in bad faith, however.  For example, although Bandler's request for "data" is too vague to constitute a "demand" for purposes of a conversion claim, Plaintiffs were, in fact, locked out of Defendants' servers and email system where their electronic data was stored.  There may also have been a misunderstanding concerning Plaintiffs' laptops, with Plaintiffs expecting that Defendants would send the laptops to them, while Defendants expected that Plaintiffs would pick up the laptops.  Given the Second Circuit's admonition that Rule 11 sanctions should be imposed "with restraint," Schlaifer Nance & Co., Inc., 194 F.3d at 334, and that Section 1927 sanctions are to be imposed only where there is "clear evidence . . . [of] bad faith," Eisemann, 204 F.3d at 396, Defendants' motion for sanctions will be denied.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted as to the Amended Complaint's Second, Third, Fifth, and Sixth Causes of Action, but denied as to the Fourth Cause of Action.  Defendants' motion for sanctions is denied.  The Clerk of the Court is respectfully directed to terminate the motions (Dkt. Nos. 41, 47, 58).

Trial of this matter will begin on November 17, 2014 at 9:30 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse.  The joint pretrial order, motions in limine, and proposed voir dire and requests to charge are due on October 17, 2014.  Any responsive papers are due October 31, 2014.

Dated: New York, New York
      September 28, 2014             SO ORDERED.

Paul G. Gardephe
United States District Judge

32